Louis Ranson *v.* C. H. Labranche et als.

A plaintiff in a case of damages *ex delicto* must make his case certain to entitle him to a recovery. A probable case will not satisfy the exigence of the law in an action.

No damage will be allowed on a simple charge of negligence, imprudence or want of skill, unless such negligence, imprudence, or want of skill, be conclusively established.

APPEAL from the District Court of the Parish of St. Charles, *Burthe,* J. *T. J. & A. G. Semmes,* for plaintiffs and appellants. *H. St. Paul* and *D. Augustin,* for defendants.

Duffel, J. The plaintiff charges that, by reason of a crevasse which occurred on the plantation of the defendants, on the 3d of May, 1858, he sustained damage, by the loss of his entire crop, &c., to the extent of one hundred thousand dollars; which he now claims.

The action is based, first, upon the neglect and default of the defendants, in not constructing their levee according to the regulations of the Police Jury of the Parish of St. Charles; secondly, in not keeping their levee in proper repair.

It is therefore evident that the burthen of proof is with the plaintiff, and that he must fail, unless he makes good, at least, one of his counts. A probable case will not satisfy the exigence of the law in an action of this kind, nor will the fact of a crevasse raise a presumption against the defendants; in short, the plaintiff must make his case certain, to entitle him to a recovery. *Greenleaf on Evidence,* vol. I, sec. 80, 4th ed.; *Morgan* v. *Mitchell,* 3 N. S., 576; *Gibson* v. *Foster,* 2 An. 507.

Having thus laid down the rule which, we think, should govern in cases of this kind, we will now proceed to the evidence.

And first: the evidence shows that three other breaks occurred in the levee of the defendants in 1858; but the loss is attributed to the first crevasse, and we are satisfied that the three subsequent ones had for immediate cause, the diversion, in part, of the force of the current from its usual channel, in consequence of the crevasse of 3d May, 1858, thus adding to the ordinary pressure of the water against this levee, an unforeseen an unexpected current.

On the first point. Did the defendants neglect to construct their levee according to the regulations of the Police Jury?

The defendants' levee was made in 1853, and the ordinances of the Police Jury were promulgated in the same year: the 24th article provides that "every levee which shall contain one perpendicular foot of water (mass), and not above three feet, shall have at least five feet base for each and every foot in height; every levee which shall contain more than three perpendicular feet of water, and not above five feet, shall have at least six feet base for each and every foot in height; every levee which shall contain more than five perpendicular feet of water, and not above six feet, shall have at least seven feet base for each and every foot in height; every levee which shall contain above six perpendicular feet of water, shall have at least eight feet base for each and every foot in height. The summit of every levee shall be of the breadth of one-third of its base. Finally, every levee shall be of such a height, that after the settling of the earth, it be still raised one foot above the level of the water when highest."

The weight of evidence tends to the conclusion that the river rose higher in

16

1858 than it had for years before, by at least five inches, and that the levee was from eight to twelve inches above the water on the day of the crevasse. Thus it is evident, that we cannot with certainty affirm that this levee was wanting in height before the year 1858, even by subtracting therefrom the elevation of seven or eight inches, which had been made during the rise of the river. Planters are not required, at their peril, to calculate, within a fraction, the dimensions of their levees, when, as is the case in the Parish of St. Charles, syndics are appointed to inspect the levees, and to direct and order the necessary works and repairs : a reasonable compliance, on their part, with the police regulations, when not otherwise in fault, will not subject them to heavy damages.

The summit of the levee and its height, were only taken a few hours after the occurrence of the crevasse, at a distance of about ten feet from the break ; the summit was found to be three and a half feet and the height six and a half feet, from which known facts it was demonstrated, by calculation, that the base could only have been twenty-three feet, when, under the ordinance, it should have been at least thirty feet, with a breadth of ten feet on the summit.

The only witness who measured the top and height of the levee, and who speaks of its width, on top, and base, says : "The measurement was taken eight or ten feet from the crevasse ; much of the levee had already been washed away. The portion of the levee which witness measured, had not been washed away when he took the measurement."

When we consider that the river was at that time at an unprecedented height ; that the levee had been elevated some seven or eight inches in haste ; that it had been *fascined* during the rise to prevent its further degradation, and to guard it against the beating waves of the raging element; we cannot, on a vague expression of a single witness, that the levee *had not been washed away*, conclude that the summit of the levee was deficient in width when constructed, or prior to the rise of 1858. And it results, as a natural consequence, that as we have no known or admitted summit, no base, in the case at bar, can be ascertained by calculation. We therefore conclude that the plaintiff has failed to make out conclusively his first point.

On the second point : Have the defendants neglected to keep their levee in good repair ?.

The 23d and 39th articles of the regulations of the police jury, provide, in substance, that all owners of land on the Mississippi river, shall constantly keep in perfect repair, a road and levee on the whole front of their land, and shall, as soon as apprised and required by the syndic, dig and fill up, every year, the holes which crawfish, muskrats or other animals may make, and use all means to prevent the progress of such holes as may appear during high water.

The evidence shows that there was a crawfish hole, at the very spot where the levee gave way, which increased from five to twelve inches in size ; that the hole made its first appearance in 1854, and was considered, during the high water of 1858, dangerous by several persons ; that no attempt was made to stop it, although two days before the crevasse, the plaintiff's overseer expressed to the defendant's overseer his fears of a crevasse on account of this hole, the reply of the latter being that *there was no danger*. The defendant's overseer also stated to the plaintiff, " that he could not make a breastwork outside of the levee, as such work might be injurious and occasion a breach in the levee ; nor could it be made inside, as it would stop the road and be making a piece of new levee, not likely to succeed ; and that there was no danger, in fact."

On the other hand, the defendants show that they were very particular in keeping their road and levee in apparently good order and repair; that they worked yearly on their levee, and never received any order from the syndic; that the hole spoken of above had, the year before, been stopped by cutting the levee, filling up and ramming the dirt down; that the levee was protected by an old levee immediately in front, a plateau or *batture* existing between the two; that as the river rose, the plantation hands were kept working on the levee all the time, keeping a watch during the night; that the levee had been all *fascined* with planks and pickets lined with bagasse. One of the witnesses says that "there was always a great deal of work done on the levee at Labranche's. There was a workman employed on their plantation, who always worked at least two months every year on the levee."

The syndic who had been named, the day after the crevasse, in the place of *Rixner*, who had resigned on the 24th April, 1858, says: "Has known the Labranche plantation since his childhood. Passed there frequently. Always saw the plantation in very good order—fences, roads, ditches and levees, always well taken care of, &c. When the witness first saw the crevasse, at 9 o'clock A. M., on the day it occurred, the break was about thirty feet wide. The balance of the levee, near the crevasse, appeared good, and would not have been condemned by witness in his capacity of syndic."

*N. St. Martin*, sworn, says: "Has been sheriff of the parish since the last fourteen years. In said capacity has had occasion to travel up and down the coast; has always found the Labranche plantation in good order, as to roads, fences, levees, &c."

*Dr. Lestrade*, sworn, says: "The levee of defendants appeared as good as that of any other planter. The roads, ditches, &c., are as good as the best that witness is in the habit of seeing in St. Charles and St. John the Baptist."

Another witness says that he has seen crawfish holes in almost all the levees in the Parish of St. Charles in 1858.

*Loriot*, the defendants' overseer when the crevasse occurred, says: "Never worked in stopping crawfish holes in high water; has seen such attempts made, but unsuccessfully. Has seen many such holes as the one mentioned, in front of other plantations, and in the levees. There were some at Bourgeois', at Chauvin & Levois'. There were two at R. Taylor's. Some of the holes spoken of above were stopped at low water, after unsuccessful attempts to stop them in high water. Was present when they attempted to stop one at Taylor's; the attempt did not succeed."

*Champagne*, being sworn, says: "During the night of the crevasse it rained very heavy—terrible weather. The wind was very high, blowing from the northeast. The wind and waves so strong that the mailboat could not make the landing at Taylor's. Witness could not stand on the levee, the waves washed over it. The boat landed at McCutchon's, on the opposite side. Saw crawfish holes in the levees, one at Champagne's, one at Zéringue's, one at Labranche's. The last one did not appear worse than the others. The one at Davis's looked larger. It is not easy to stop holes during high water."

Another witness, *Touzanne*, says: "On the day of the crevasse, on the whole distance, from Labranche to Davenport, found that the river passed over every levee, with the exception of three plantations, viz., Dorvin's, Chauvin & Levois', and Davenport's. Has seen many crawfish holes this year (1859): witness has attempted to stop at least fifty such holes; never succeeded. In 1858 saw a good

many; in fact, there were holes in almost every levee. Never knew of attempts to stop crawfish holes to prove successful. At Taylor's, they tried two or three times, without success. At Bougère's they had boxed a hole, and the box was in the road; still the water continued to flow. At Bourgeois', they had boxed the hole outside of the levee, and the attempt was equally unsuccessful. At Augustin's, the box was made both inside and outside of the levee, with no better success. At none of these places did crevasses occur."

*Ursin Cliteaux*, Taylor's overseer, being sworn, says: "In 1857, had two crawfish holes in his levee (Taylor's levee); one had about three inches diameter; made a great deal of work to stop it, but did not succeed. The first work which witness did was a breastwork outside, in high water, when the hole was discovered. When the river went down, dug almost the whole depth of the levee, and two-thirds of its width on a length of one hundred and twenty feet. It was dug at a depth of seven feet. Witness would then put about one foot of dirt and ram it down. Did so until the hole appeared completely stopped. Notwithstanding all this work, the hole is still running."

*Theodule Brou*, being sworn, says: "Before the crevasse, saw crawfish holes all along the coast, and in St. John the Baptist; saw one at Labranche's, at Chauvin & Levois', at Whitehead's. The weather was terrible on the night of the crevasse—heavy wind, strong lightning. The evening preceding the crevasse, passed before the Labranche levee at eight o'clock in the evening. In going down before night, saw the hole in the Labranche levee, which he did not believe dangerous, from having seen similar holes in other places."

The sheriff, *St. Martin*, says that about eight days before the crevasse, *Lêche* stated to him that there was a dangerous hole in the Labranche levee, but that he did not consider it more so than similar ones which he had seen. "If witness had deemed it dangerous, he would have considered it his duty to notify the owners."

*Touzanne*, a witness for plaintiff, says: "Last year (1858) the river was higher than witness ever saw it; in many places the water passed over the levees, and planters had to overtop them all the time. In that year the States of Louisiana, Mississippi and Arkansas were inundated by a great many crevasses. Almost all the levees were cut by crawfish holes."

*Mayronne*, another witness for plaintiff, says: "He considered the whole parish as being in great danger. The weather was very bad, and had been the day before, and during the night; there was a great deal of wind and rain. The waves were heavy, the storm was very violent; the rain was such as to wash the levees and roads."

*Lêche*, another witness for plaintiff, says: "All along the coast, from Zéringue's up to Roussel's, the levees had to be raised in haste to keep up with the water, by means of planks, dirt and bagasse. The same work had been done on the Labranche levee. It appeared like anywhere else. With the exception of the hole mentioned by witness, the Labranche levee appeared very sound."

*Levet*, still another witness for plaintiff, said, on his cross-examination: "Witness trades on the river as high as Donaldsonville. From Donaldsonville to the city, all the planters were very busy working in raising their levees, in consequence of the high stage of the water. The water was very high before the crevasse, and running over almost all the levees," &c.

We attach very little importance to the circumstance that the summit of the levee was only, on the day of the crevasse, three and a half feet in width, for the pickets and bagasse placed in front show conclusively that it was to prevent its

further deterioration; that the levee had been previously mined by the waves, <span style="float:right">Ranson<br>*v.*<br>Labranche.</span> would not, under the evidence, be questioned by planters bordering the Mississippi; and no blame can attach on this score, when, as the facts show, the defendants employed the means in use in the neighborhood, and kept their hands constantly at work on the levee.

Reason would teach us that when, as was the case here, the same state of things existed in a whole community without any apprehension of danger, excepting from a few, and with the honest belief by many, based on facts, that the cause of the danger, if any danger existed, could not be guarded against, no damage will be allowed on a simple charge of negligence, imprudence or want of skill, unless such negligence, imprudence or want of skill be conclusively established.

A close examination of the whole case, satisfies us that the defendants must be fully acquitted of any imputation of gross neglect, and leaves us in doubt, to say the most, of any want of care, prudence or skill on their part. We cannot say, from the evidence, that the calamity was not wholly due to the act of God.

It is therefore ordered, that the judgment of the District Court, which was in favor of the defendants, be affirmed, with costs.

Land, J., absent.